**SO ORDERED.**

**SIGNED this 19 day of October, 2007.**

_____
**Randy D. Doub
United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
FAYETTEVILLE DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| JOHN RICHARD TIDROW | 04-02922-8-RDD |
| DEBTOR | |
| AVI ROTH | |
| Plaintiff | ADVERSARY PROCEEDING NO. |
| v. | 04-00161-8-RDD-AP |
| JOHN RICHARD TIDROW | |
| Defendant. | |

**MEMORANDUM OPINION**

The trial of this adversary proceeding filed by the plaintiff, Avi Roth, pursuant to 11 U.S.C. § 523(a)(2) to determine the dischargeability of debts owed to Mr. Roth by the defendant, John Richard Tidrow, was held on September 27, 2007 in Wilson, North Carolina. John Richard Tidrow filed a petition for relief pursuant to chapter 7 of the Bankruptcy Code on April 10, 2004. For the reasons stated below, judgment will be entered in favor of the debtor.

This bankruptcy court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(I), which this court may hear and determine.

**FACTS**

Mr. Tidrow testified that, after spending ten years in the army and building aircraft parts and other turnkey products at his own business in Fayetteville, he became part owner and chief executive officer of a startup company known as Millennium Armor Corporation (MAC) in 2001. MAC developed technologies for ballistics protection in the forms of soft armor and hardened plates. Mr. Tidrow's position with the company involved general oversight of the manufacture and production of aircraft components. He was responsible for transitioning products from the research and development stage to a marketable product. There were two additional owners of MAC: Mr. Lenny Feiner, who was responsible for fund-raising and investor relations, and Mr. Pat Lenaughan, who was in charge of research and development.

Mr. Tidrow explained that bullet-proof vests are tested by the National Institute of Justice ("NIJ") and are certified at several levels, those being Level IIA, II, III, and IV. Certification at these levels is determined by the type of bullet and speed of the projectile stopped by the vest.

Mr. Tidrow testified that, during the first quarter of 2002, MAC had produced NIJ certifications for vests and was in the process of putting together fire testing and other requirements necessary for the Federal Aviation Agency to allow use of its products on aircraft. The company was also working with General Motors on a new vehicle. However, the company was concerned with

operating costs.  Through May 2002, the company had approximately $1,000,000.00 in loans outstanding and approximately $1,000,000.00 in investments.

In March or April of 2002, Mr. Feiner contacted Mr. Tidrow regarding an investor, Mr. Roth. He indicated that Mr. Roth wanted to assist with raising funds for the company.  Mr. Roth insisted on receiving a letter authorizing him to raise funds prior to investing.  On April 11, 2002, a letter of authorization was issued to Mr. Roth by Mr. Tidrow, allowing him "to represent Millennium Armor Corporation (MAC) in obtaining financing and to make presentations prepared by MAC for this purpose."  Plaintiff's exhibit 5.  In addition to this letter, an agreement was made that Mr. Roth would receive a 5% commission on all funds he raised for MAC.  Mr. Tidrow testified that because his responsibilities did not concern investors, he did not speak with Mr. Roth prior to signing the letter. According to Mr. Tidrow, the attorneys and Mr. Feiner handled solicitation of investors.  Mr. Roth eventually raised $225,000.00 for MAC, including $50,000.00 of his own money.

Mr. Tidrow testified that his first conversation with Mr. Roth occurred during a conference call, prior to Mr. Roth's investment.  At that time, they discussed the opportunities of MAC in general, including their current contracts, successes with testing, and an opportunity in Israel which had been raised by Mr. Roth.  Mr. Tidrow indicated his impression was that Mr. Roth had already made the decision to invest prior to the call since he had already raised funds from others for MAC. During the conversation, the parties did not discuss what the investments would specifically be used for, just that it would be used for the pursuit of contracts.  There were also no discussions regarding restrictions on how the investments could be spent.  Mr. Tidrow testified that he had bad experiences with restrictions on loans and would not have accepted the funds with restrictions on their use.

Mr. Tidrow testified that Mr. Roth presented MAC with the opportunity to go to Israel to test for a contract.  The test in Israel was for the opportunity to enter into a contract for the provision of

3

bullet-proof plates with a potential value greater than $100 million.  Mr. Roth had explained that he had connections in Israel and also had connections to get the funds necessary to fund the test.  In response, Mr. Tidrow told Mr. Roth that the company needed funds for production of products, testing, certification and to continue pursuing contracts.  Mr. Roth never asked about any debts the company already had.  Mr. Tidrow described the operating expenses of MAC to Mr. Roth and about the different projects MAC was developing.  Mr. Tidrow did not discuss funding in great detail with Mr. Roth, as it was his understanding that Mr. Roth was already interested in investing in the company, as Mr. Tidrow knew Mr. Roth had discussed the investment with MAC's attorneys.

Mr. Tidrow next discussed the debenture agreement entered into with Mr. Roth and his group of investors.  Plaintiff's exhibit 9.  He explained that the non-dilution clause, which gave Mr. Roth and the other investors the option to convert their debenture to stock in the company, had been changed for the investors brought in by Mr. Roth.  The language in this clause is different from the language used in the other debentures given by MAC.  Further, the debenture provided Mr. Roth was to have been repaid within six months of his investment, with the first interest payment due and payable thirty days from the date of the debenture agreement.

Mr. Lenaughan conducted the pre-test and certified that the plates for the Israeli test could withstand a Level IV shot.  The test in Israel took place during the first week of May 2002.  If the test had been successful, MAC would have been under contract immediately.  However, because the product was not what the company in Israel required, a Level IV plate, MAC failed the test and lost the contract.  Upon returning from Israel, Mr. Tidrow investigated the cause of the failed test.  It was determined that the test in Israel failed because the shot packages prepared for the pre-testing of the product were not prepared at the correct level.  The pre-test was prepared at Level III instead of Level IV.

Because of the failure in Israel, by the time the first interest payment became due under Mr. Roth's debenture agreement, there was not enough money available to make the payment. Mr. Tidrow indicated that decisions made about paying the expenses of MAC was his responsibility, and he determined that other debts should be paid before Mr. Roth's interest payment.

Mr. Tidrow explained that MAC ultimately failed because of the failure of zylon, a major component in the products developed by MAC. It was determined that, over a period of time, zylon lost thirty percent of its strength to withstand penetration because of sunlight and other factors. Because of that failure, seventy-five percent of the material necessary for making its patented products was not structurally sound.

After the failure in Israel and the failure of zylon, MAC stopped accepting investor money. However, Mr. Tidrow continued to put his own money, as well as money from his company, John Tidrow and Associates, into the corporation from June 2002 until June 2003. In June 2003, MAC was notified that it was not the successful bidder on a government contract for which MAC had expended a large amount of money. In preparation for the bid, and to cover operating expenses, Mr. Tidrow contributed between $305,000.00 and $310,000.00 from himself and John Tidrow and Associates.

Mr. Tidrow testified that he did not tell Mr. Roth anything that was untrue or that he believed to be untrue. He indicated that he did not intend to create a false impression for Mr. Roth. All investors, including Mr. Tidrow himself, lost money.

Mr. Pat Lenaughan testified that he was employed by MAC from February 2001 until May 2002. He was also a major shareholder of the business. He testified that during his time of employment, the company was operational and was working on procuring contracts and developing

opportunities for the business to go forward. He indicated that Mr. Tidrow was involved in that process and gave no indication that he was not serious about succeeding in the business.

Mr. Lenaughan indicated that he was responsible for research and development at MAC. During the time in question, Mr. Lenaughan indicated that approximately $45,000.00 was spent on research and development at MAC.

Mr. Lenaughan admitted that he was responsible for preparing the plates which were sent to Israel for testing. Mr. Lenaughan testified that the plates taken to Israel were prototype plates, developed with materials on hand. The purchase order for the materials was probably under $5,000.00. He indicated that the plates were tested several times by him, and there was some success with stopping a Level IV projectile. However, the plates had not been officially tested and were not ready for production. Mr. Lenaughan testified that he recommended to Mr. Tidrow that the plates be officially tested prior to the trip to Israel, but that was not done. After the plates failed the test in Israel, Mr. Lenaughan was asked to resign. Mr. Lenaughan indicated that he accepts some responsibility for the research and development of the plates, as well as the testing. However, it was an experimental plate.

Mr. Roth testified that he first became aware of MAC in the middle of December 2001. He was introduced to the company by Ken Thorpe in Dallas, Texas. At that time, he found out that MAC was a fairly new company, which was putting together a new ballistic material that was significantly lighter than anything else on the market. Mr. Roth testified that he received some brochures and pamphlets about the company, which he read. Plaintiff's Exhibit 4. Although he never purchased stock in the company, he did loan money to the company, which is evidenced by the debenture agreement with MAC. Plaintiff's Exhibit 9. Mr. Roth loaned MAC $50,000.00 on April 19, 2002. Plaintiff's Exhibits 1 and 15. The debenture agreement specified that Mr. Roth was to be

repaid $75,000.00 within six months of the loan. The debenture agreement also gave Mr. Roth the right to convert the debt owed by MAC into MAC stock, which he indicated he might have done had the test in Israel been successful.

Mr. Roth testified that, several weeks prior to the loan, he had concluded that it would be good for MAC and an Israeli company to do business together. After some correspondence, the Israeli client expressed a willingness to test the material, so a date was established to go to Israel. Mr. Roth testified that, at the last minute, he was informed during a telephone conversation with Mr. Tidrow and Mr. Feiner that the trip would have to be cancelled because the corporation did not have the money or the material to produce the product. At that time, Mr. Roth suggested that he make a small loan to the company and check with his acquaintances to see if they were willing to loan money to produce the material. Mr. Roth testified that he requested a letter of authorization to raise funds on behalf of MAC and that such a letter was provided by Mr. Tidrow. Plaintiff's Exhibit 5. He then approached some acquaintances and made a presentation to them about the company. They also were interested in making a loan. At that time, Mr. Roth testified he believed that the purpose of the loan was to purchase the material necessary to complete the test in Israel.

At the time of the loan, Mr. Roth was not informed of any outstanding loans or of the operating expenses of MAC. He was surprised to learn that the money had been used for operating expenses. He indicated that he would not have made the loan if he had known that the money was to be used for general operating expenses instead of for the specific purpose of conducting the test in Israel and purchasing the materials for that test. Mr. Roth testified that the representation made to him was that the money would be used for that purpose. However, he admitted that the purpose for the funds was not put in writing and that Mr. Tidrow did not verbally express that the money would be used for raw materials. He simply indicated that the test in Israel could not be performed

7

because of a lack of materials. Mr. Roth also indicated that he did not know the amount of money MAC had, and did not make an attempt to find out prior to his investment. He based his decision to invest on an executive summary of forward projections for a number of different projects on which MAC was working. Although Mr. Roth knew that MAC was seeking outside financing, he did not ask about other investments made in the company. Mr. Roth admitted that, if MAC had been successful in winning the Israeli contract, he and the other persons he had solicited, would have reaped substantial financial benefits.

## ANALYSIS

11 U.S.C. § 523(a)(2)(A) provides

(a) A discharge under section 727 . . . does not discharge an individual debtor from any debt –

    . . . .

   (2)  for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
       (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

The burden of proving the elements of § 523(a)(2)(A) is on the plaintiff. In this matter the plaintiff has failed to carry that burden by a preponderance of the evidence. Although MAC did receive money from Mr. Roth, Mr. Roth has not proved that the money was obtained by false pretenses, a false representation, or actual fraud. All of these require that the defendant make a false representation with an intent to deceive the plaintiff and that the plaintiff justifiably rely upon the representation. Mr. Roth failed to prove any of these elements. Mr. Roth admitted that the restriction on the use of the funds he provided to MAC was not reduced to writing. Mr. Tidrow did not verbally express that the money would be used only for raw materials. Had the restricted use been the intention of the parties, the restrictive language could have been included in the written debenture

agreement. Other modifications to the written debenture agreement, such as the non-dilution language, had been made.

Representations made by Mr. Tidrow as to a return on Mr. Roth's investment were genuine, as Mr. Tidrow continued to invest in MAC, even after he stopped taking money from investors. Therefore, there was no intent to deceive.

Finally, the court finds that the plaintiff's reliance on any alleged false statements or misrepresentations made by Mr. Tidrow was not justified. Mr. Roth admitted that he made no inquiries and did no research into MAC's financial condition prior to his investment while at the same time soliciting other investors. There is also some question as to Mr. Roth's credibility as he, at the trial of this matter, referred to the money given by him to MAC as a loan and not an investment. However, in his responses to interrogatories, Mr. Roth referred to the money as an investment multiple times. In addition, Mr. Roth's investment was $50,000.00, while the written debenture required a return of $75,000.00 principal.

In conclusion, Mr. Roth made a bad deal. Mr. Roth was not defrauded. Therefore, Mr. Roth has failed to meet his burden of showing that this debt should be excepted from discharge pursuant to § 523(a)(2)(A). Therefore, this debt is **DISCHARGEABLE**.

A separate judgment will be entered.

**SO ORDERED.**

END OF DOCUMENT